PHILIP CHIAPPISI & others[1] *vs.* GRANGER CONTRACTING Co. INC. & another.[2]

Suffolk.  February 7, 1967. — March 3, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Contract,* Building contract.

Where a subcontractor required by his subcontract to fill with insulation the flutes in a metal deck of a building under construction discovered that the flutes in the deck as installed in accordance with the manufacturer's instructions were substantially larger, requiring more insulation material, than the flutes shown on a plan used by the subcontractor in submitting his bid, but made no written claim for "extra cost" until after completing his work on the deck, he was barred from recovering from the general contractor for such extra work by provisions of the subcontract that written notice of claim for "extra cost" resulting from "any instructions" must be given to the architect "before proceeding to execute the work" and that "No such claim . . . [should] be valid unless so made."

---

[1] The plaintiffs are the members of a partnership doing business as Chiappisi Brothers.

[2] The codefendant is United States Fidelity and Guaranty Co. of Baltimore, Maryland, surety on Granger's bond securing payment for labor and materials.

PETITION filed in the Superior Court on June 22, 1964.

The suit was heard by *Sgarzi, J.*, on a master's report.

*Sally A. Corwin (Joseph M. Corwin* with her) for the plaintiffs.

*Robert J. Martin (Richard W. Mirick* with him) for the defendants.

CUTTER, J.  Granger Contracting Co. Inc. (Granger) as general contractor entered into a contract with a town to build a high school.  Granger made a subcontract with the plaintiffs (Chiappisi) under which Chiappisi agreed to furnish all labor and materials for completing the work dealt with in § 19 of the specifications (lathing and plastering).  By the subcontract Chiappisi agreed to be bound to Granger by the plans and specifications, including all general conditions.[3]

To enforce claims arising with respect to the subcontract, Chiappisi brings this petition under G. L. c. 149, § 29 (as amended through St. 1962, c. 696; see later amendment St. 1964, c. 609, §§ 4, 5), against Granger and the surety on its payment bond (fn. 2).  The case was referred to a master.  His report, denying compensation for certain work alleged to be extra work, was confirmed.  Chiappisi appealed from the interlocutory decree confirming the master's report and from a final decree which allowed only claims for other amounts (not directly related to the alleged extra work).  The facts are stated upon the basis of the master's report.

The work to be done by Chiappisi included the installation of Zonolite Spray-Insulation on the metal flute deck

---

[3] The general conditions included (emphasis supplied), art. 16: *"If the contractor claims that any instructions by drawing or otherwise involve extra cost under this contract,* he shall give the Architect written notice thereof within a reasonable time of receipt of such instructions, and in any event before proceeding to execute the work, except in emergency endangering life or property . . . .  No such claim shall be valid unless so made," and art. 37: "The contractor agrees to bind every sub-contractor and every sub-contractor agrees to be bound by the terms of the . . . General Conditions, the Drawings, and Specifications *as far as applicable to his work,* including the following provisions of this article . . . .  The sub-contractor agrees . . . (c) To make all claims for extras . . . to the Contractor in the manner provided in the General Conditions of the Contract . . . for like claims by the Contractor upon the Owner, except that the time for making claim for extra cost is one week."

over the science area of the building. The flutes were to be filled with insulation and then an even one quarter of an inch coat of Zonolite was to be applied over the entire surface. Chiappisi, from a drawing which dealt with the science area of the building, measured the size of the flute openings as shown on that plan. From these measurements and the area of the deck, an estimate was made of the materials and labor necessary to fill the flutes and cover the surface. Chiappisi used these computations in bidding on the job.

The drawing which was used by Chiappisi in making the calculations, if measured to scale, shows the flute openings in the metal deck to be one and one-quarter inches wide at the mouth. The master found that this "drawing was, however, intended by the architect who prepared it to be schematic or symbolic, rather than an actual diagram of the roof deck." The drawing does not disclose this intention clearly. In any event, the metal deck was installed in accordance with the manufacturer's standards, and, as installed, the roof deck had flute openings of a width of four and one-quarter inches (see fn. 4, *infra*).

While the work was in progress, it developed that more material was needed than Chiappisi had estimated. Alphonse Chiappisi went to the school and found that the flute openings which were being filled were wider than had been estimated from the drawing. Before Alphonse "left the area he saw one . . . Gillette, the job superintendent for Granger. He told Gillette 'this is an extra.' Gillette replied that the roof was installed as shown in the drawings. . . . [Alphonse] Chiappisi then said that it would be necessary for him to use more material than estimated and he wanted to be paid for it. Gillette replied that Chiappisi would have to take it up with 'the office.'. . . Alphonse Chiappisi ordered more Zonolite and his men continued with the science area roof deck and completed filling the flutes." In a bill sent to Granger on April 29, 1963, after the work in the science area was completed, "Chiappisi made no reference to or any charge for extra work done in the science area roof deck."

On May 23, 1963, Chiappisi wrote to Granger asking $2,927 for added work involved in connection with the steel deck. This was the first written notice that Granger received from Chiappisi concerning a claim for extra money for this work. It was also the first notice anyone at Granger, other than Gillette, had that Chiappisi intended to make such a claim.

"There was no 'emergency endangering life or property' which necessitated Chiappisi's performing the work in the science area without notifying Granger of . . . [the] claim for extras before doing the . . . work . . . . There was no evidence that . . . Granger ordered Chiappisi to do any extra work or authorized any extra work."

1. Chiappisi contends that the architect's drawing, showing narrow flute openings in the metal deck, appeared to be a scale drawing, related to § 19 of the contract upon which Chiappisi was the subcontractor. It would be difficult, of course, to bid intelligently on such work unless the sizes of the spaces to be filled and covered were adequately specified. We need not determine, however, whether the specifications were faulty or misleading[4] or whether filling the wider flute openings was "extra work." We think that the decisive issue is whether Chiappisi followed the procedures governing claims for extra work.

2. Article 16 of the general conditions (fn. 3) requires that written notice be given to the architect "within a reasonable time" after receipt of "instructions by drawing or otherwise" concerning work claimed to constitute extra

---

[4] The master suggests that the drawing used by Chiappisi may have been in some respects inconsistent with other drawings in the specifications and possibly also with the specifications (§ 9) for the metal deck. The metal deck was installed in accordance with the manufacturer's standards, referred to in § 9, and with a shop drawing (approved by the architect), not found to have been shown to Chiappisi. A specimen section of the metal flute deck was produced during the arguments. If installed with one surface toward the roof, the metal flute spaces to be filled would be one and one-quarter inches wide and one and one-half inches deep. If exposed with the reverse surface toward the roof, the flute spaces to be filled would be four and one-quarter inches wide and of the same depth. The architect's drawing, relied upon by Chiappisi, showed the narrow flute spaces on the underside of the flute deck. They were installed with the narrow flute spaces pointing upward and the broader flute spaces pointing down, as the manufacturer intended.

work.   Chiappisi, after inspecting the flute openings "four and one-quarter inches in width" as actually installed and after talking with Gillette, knew that there might be the basis of a claim for "extra" work.   The physical presence on the structure of wider flute openings than had been anticipated was a condition at variance with Chiappisi's interpretation of the architect's scale drawing on which the bid was based.   In every practical sense (viewed in the light of Gillette's contention to Alphonse Chiappisi that the roof was properly installed) the situation amounted to an "instruction" within art. 16.   Obviously, Chiappisi was expected to fill the flute openings as they then existed (fn. 4). In the circumstances, arts. 16 and 37 reasonably required (a) prompt inquiry by someone in behalf of Chiappisi at "the office" as Gillette had suggested, and (b) that Chiappisi give immediate written notice to the architect, as a prerequisite of any claim for "extra cost."   If such notice had been given, Granger might have taken steps to protect itself (after discussion with the town authorities and the architect) against liability for what seems at least an ambiguity arising from the plans.   There was no emergency requiring Chiappisi to proceed at once without giving written notice.   Because Chiappisi proceeded without such notice and postponed until after the work was completed all written mention of any claim for extra work, there can be no recovery.

> *Interlocutory decree and*
> *final decree affirmed.*