SUTTON CORPORATION *vs.* METROPOLITAN DISTRICT
COMMISSION.

Middlesex. March 6, 1996. - July 16, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Public Works,* Extra work. *Contract,* Public works, Modification, Perfor-
mance and breach, Damages. *Practice, Civil,* Master: findings. *Damages,*
Breach of contract, Interest. *Interest. Constitutional Law,* Referendum.
*Words,* "Changed conditions."

A contractor awarded a contract for site preparation as part of the replace-
ment of a bridge established that there was a "changed condition" at the
site within the meaning of G. L. c. 30, § 39N, such as would entitle it to
an equitable adjustment in the contract price and, where the contractor
fulfilled the procedural prerequisites of the statute with regard to timely
notice of its claim, the contractor was entitled to be recompensed for the
additional expenses it incurred in completing the contractually required
work. [204-208]

In a contract dispute, the master's conclusion that the Metropolitan District
Commission violated a construction contract by not approving the
contractor's use of a substitute method of site preparation for the method
specified in the contract was clearly erroneous in light of the master's
subsidiary findings to the effect that the two methods were not equiva-
lent within the meaning of G. L. c. 30, § 39M. [208-210]

Where the Metropolitan District Commission did not breach a site prepa-
ration contract the contractor was not entitled to damages for the extra
costs of removing and replacing the spoils materials at the site that did
not conform to contract specifications. [210-211]

The master hearing a construction contract dispute, in which he awarded
an equitable adjustment to the contractor pursuant to G. L. c. 30,
§ 39N, for changed site conditions, did not err in looking to the formula
for paying for extra work set forth in the contract to make his calcula-
tion of damages, and the damages the master awarded were reasonable.
[211-213]

General Laws c. 231, § 6C, as amended through St. 1993, c. 110, § 224,
and § 6I, inserted by St. 1993, c. 110, § 225, did not apply to a final
judgment entered on August 16, 1993, where the law did not become ef-
fective until after the judgment entered. [213-214]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 20, 1982.

The case was heard by *James F. McHugh, III*, J., on a master's report.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Harvey B. Heafitz* (*Carol McKenna* with him) for the plaintiff.

*Christopher W. Morog*, Assistant Attorney General (*Jason Barshak & James A. Sweeney*, Assistant Attorneys General, with him) for the defendant.

*Hugh J. Gorman, III, & Joel Lewin* for Utility Contractors Association of New England, amicus curiae, submitted a brief.

*Joseph M. Corwin & Sally A. Corwin* for Associated Subcontractors of Massachusetts, Inc., amicus curiae, submitted a brief.

*Joel Lewin & Hugh J. Gorman, III*, for Associated General Contractors of Massachusetts, Inc., & another, amici curiae, submitted a brief.

LYNCH, J. Sutton Corporation (Sutton) brought this action against the Metropolitan District Commission (MDC) in April, 1982, for damages relating to site preparation work done on the replacement of the General Lawrence Bridge (bridge) in Medford.[1] A master was appointed under Mass. R. Civ. P. 53, as amended, 386 Mass. 1237 (1982), who issued a report containing extensive findings of fact and rulings of law. A Superior Court judge adopted the master's report in its entirety and awarded Sutton $255,504.61 plus $346,903.72 in interest. The MDC appealed from the judgment; Sutton cross appealed. The Appeals Court reversed the decision of the Superior Court. *Sutton Corp.* v. *Metropolitan Dist. Comm'n*, 38 Mass. App. Ct. 764 (1995). We granted Sutton's application for further appellate review and now affirm the decision of the Superior Court.[2]

---

[1] Sutton also initially brought a claim against Vibroflotation Foundation Company. Geotechnical Engineers, Inc.; Somerville Engineers, Inc.; and United States Fidelity and Guaranty Company were also parties. All of these additional parties were dismissed prior to the determination of the case on the merits. *Sutton Corp.* v. *Metropolitan Dist. Comm'n*, 38 Mass. App. Ct. 764, 764 n.1 (1995).

[2] We acknowledge the amicus briefs of Utility Contractors Association of New England, Inc.; Associated Subcontractors of Massachusetts, Inc.; and Associated General Contractors of Massachusetts, Inc., and Construction Industries of Massachusetts, Inc., on behalf of the plaintiff.

A. *Facts.* We recite the significant facts as found by the master.[3] Sutton bid for and was awarded a contract with the MDC to conduct site preparation as part of the replacement of the bridge. As part of its contract, Sutton was responsible for the installation of sand drains on the site of the bridge. Sutton contracted with Vibroflotation Foundation Company for the use of Vibroflotation's patented system of sand drain installation utilizing the "Dutch Bailor" method, which was one of the methods sanctioned in the contract specifications.[4]

Sutton agreed to charge $3 per linear foot for a total of 141,362 linear feet of sand drains. Sutton estimated that it would take approximately twenty minutes to install each of 1,570 sand drains over a period of thirty-five working days for a total cost of $424,086.

Sutton began installing trial sand drains on April 13, 1981, and immediately encountered a multitude of problems. Use of the "Dutch Bailor" method, as designed, resulted in sand drains that did not meet contract specifications. In attempts to explain these problems, on-site observers hypothesized that either the clay material in one of the layers of the soil was overcompacted or the clay in another layer contained more gravel than anticipated. Everyone agreed that the conditions at the site were unusual and that the resulting sand drains were unacceptable. On April 24, 1981, after two weeks of

[3]We agree with the Appeals Court that the parties' objections were not sufficient to raise a challenge to the master's subsidiary findings of fact. See *Sutton Corp.* v. *Metropolitan Dist. Comm'n, supra* at 765-766. Therefore, we accept those findings "unless they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master, or are otherwise tainted by error of law. Mass. R. Civ. P. 53 (h) (1), as amended, 386 Mass. 1237 (1982)." *Bishay* v. *Foreign Motors Inc.*, 416 Mass. 1, 3 n.4 (1993).

[4]The master found: "A sand drain is a vertical hole in the ground, approximately 12 [inches] in width and, in this instance, 90 to 100 [feet] in depth. . . . The 'Dutch Bailor' or 'jetted' method of sand drain installation involves the use of a dropping head or bailor which pulsates in a vertical manner as it is lowered into the ground. A high pressure jet of water is sprayed into the hole liquefying the earth; the earthen materials float to the surface in suspension as the water level in the hole rises, ultimately flowing out onto the work area surface. . . . Once the water drains from the hole, the hole is filled with sand. . . . The purpose of the sand drains is to provide a route for the moisture that is trapped in the soil below to percolate to the surface, thus permitting quicker compaction of the soil."

failed attempts to improve the situation, Sutton stopped installing sand drains.[5]

By a letter dated April 27, 1981, Sutton advised the MDC that it had encountered a "changed condition" within the scope of G. L. c. 30, § 39N (1994 ed.), and requested permission to use a substitute system for compacting the soil. Sutton conducted some successful tests of the substitute "wick drain" system (which were paid for by the MDC), but ultimately the MDC declined to authorize its use.[6] Eventually, Sutton resumed work using a highly-modified Dutch Bailor system. With the new system, Sutton was able to install sand drains acceptable to the MDC, but only at much greater cost and time than anticipated.[7]

As a result of the sand drain installation, a significant amount of "spoils material" accumulated on the site.[8] Because the spoils material did not meet contract specifications for ground cover, the MDC required Sutton either to mix it with other material to bring it within contract specifications or to move the material offsite and replace it with soil that complied with the contract. Sutton asked instead to move the material to the preload area, another portion of the construction site. The MDC declined. Sutton then chose to remove the spoils material and replace it with "gravel borrow," for a total cost of $153,094.

---

[5]The master found that "[t]he resident engineer noted in his Project Diary entry for that day as follows: 'there is a definite problem with the existing conditions.' "

[6]The master found: "The wick or Alidrain system involves inserting an oblong shaped piece of plastic tubing into the ground by means of a long mandrel. A jet spray of water is used to assist in clearing a path through the earth for the mandrel. The plastic tube remains in the hole after the mandrel is withdrawn. There are numerous pores or openings in the plastic tube or 'wick' through which the moisture in the soil seeps and rises to the surface, thus performing the same function as the sand drains in facilitating the consolidation of the soil. The wick system was not among the drainage systems included in the contract specifications."

[7]The master found that "[r]epresentatives of the MDC . . . were well aware throughout the course of the sand drain installation of the length of time that was involved in the installation of the sand drains, as a result of the modifications to the Dutch Bailor System, and that the attendant delay would result in increased expense to Sutton."

[8]The spoils material was a byproduct of sand drain installation: the jetted water used in creating the sand drains carried soil, residue clay, dirt, and gravel out of the hole being created to settle elsewhere on the construction site.

B. *Changed condition.* Sutton first argues that it is entitled to an equitable adjustment under the changed conditions provision of the contract. The Superior Court judge adopted the master's rulings that: (1) there was a "changed condition" within the meaning of G. L. c. 30, § 39N; and (2) Sutton satisfied the procedural requirements for an equitable adjustment claim under the "changed conditions" provision of the contract.[9] The MDC argues, first, that there was no changed condition. In the alternative it argues that, even if there was a changed condition, Sutton's claims are barred because they fall under the purview of the "extra work" provision of the contract (Article XVIII) and Sutton failed to follow the detailed procedural prerequisites for such a claim.[10] It was on this latter ground that the Appeals Court reversed the deci-

---

[9]General Laws c. 30, § 39N (1994 ed.), provides, in relevant part:

"Every [public works construction] contract . . . shall contain the following paragraph in its entirety . . . :

"If, during the progress of the work, the contractor or the awarding authority discovers that the actual subsurface or latent physical conditions encountered at the site differ substantially or materially from those shown on the plans or indicated in the contract documents either the contractor or the contracting authority may request an equitable adjustment in the contract price of the contract applying to work affected by the differing site conditions. A request for such an adjustment shall be in writing and shall be delivered by the party making such claim to the other party as soon as possible after such conditions are discovered. Upon receipt of such a claim from a contractor, or upon its own initiative, the contracting authority shall make an investigation of such physical conditions, and, if they differ substantially or materially from those shown on the plans or indicated in the contract documents or from *those ordinarily encountered and generally recognized as inherent in work of the character provided for in* the plans and contract documents and are of such a nature as to cause an increase or decrease in the cost of performance of the work or a change in the construction methods required for the performance of the work which results in an increase or decrease in the cost of the work, the contracting authority shall make an equitable adjustment in the contract price and the contract shall be modified in writing accordingly" (emphasis added).

[10]Article XVIII of the contract provides:

"The Contractor shall do any work not herein otherwise provided for, when and as ordered in writing by the Engineer, or his agents especially thereto authorized in writing, and shall, when requested by the Engineer so to do, furnish itemized statements of the cost of the work ordered and give the Engineer access to accounts, bills and vouchers relating thereto. If the Contractor claims compensation for extra work not ordered as aforesaid, or for any damage sustained, he shall, within one week after the beginning of any such work or of the sustaining of any such damage, make a written

sion of the Superior Court and ruled in the MDC's favor. 38 Mass. App. Ct. at 760.

We begin with the general rule that "contractor's invocation of remedies available under either the contract or applicable statutes such as G. L. c. 30, § 39N, must be addressed by the public agency in good faith. *Glynn* v. *Gloucester*, 9 Mass. App. Ct. [454, 460-461 (1980) (*Glynn I*)]." *Glynn* v. *Gloucester*, 21 Mass. App. Ct. 390, 397 (1986) (*Glynn II*). Here, Sutton followed the procedures set out in § 39N (and incorporated in the contract as part of Article XIX); once Sutton discovered what it believed to be a changed condition, it ceased operations and notified the MDC by letter seeking an equitable adjustment. The MDC does not dispute that Sutton fulfilled the procedural prerequisites of § 39N.

The master found that, in the course of the sand drain installation, Sutton had experienced a "Type II" changed condition, because "the site conditions [were] substantially in conformance with the contract documents, but the installation system specified did not perform as anticipated."[11] The Ap-

statement of the nature of the work performed or damage sustained to the Engineer, and shall on or before the fifteenth day of the month succeeding that in which any such extra work shall have been done or any such damage shall have been sustained, file with the Engineer an itemized statement of the details and amount of such work or damage, and unless such statements shall be made as so required his claim for compensation shall be forfeited and invalid, and he shall not be entitled to payment on account of any such work or damage. The cost of extra work shall not include any general or indirect overhead charges and shall be determined by such method of compensation as approved by the [MDC] and provided for in the Proposal. Any equipment employed by the Contractor for use in extra work shall be of such amount and at such rental rates as the Engineer approves. The determination of the Engineer shall be final upon all questions of the amount and value of extra work."

[11]The standard changed conditions provision for Federal contracts "enables the contractor to obtain an equitable adjustment in price if it encounters 'during the progress of the work [1] subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or [2] unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering . . .' in the type of work being done." *United Contractors* v. *United States*, 368 F.2d 585, 594 (Ct. Cl. 1966). See *Stock & Grove, Inc.* v. *United States*, 493 F.2d 629, 644-645 (Ct. Cl. 1974); *Charles T. Parker Constr. Co.* v. *United States*, 433 F.2d 771, 772 n.1 (Ct. Cl. 1970); *Kaiser Indus. Corp.* v. *United States*, 340 F.2d 322, 324 (Ct. Cl. 1965). A claim for an equitable adjustment under the second clause of the standard provision is commonly referred to as a "Type II" changed condition claim.

peals Court ruled that the master's conclusion was "incorrect as matter of law" because it relied on the failure of the installation system rather than the soil conditions, *Sutton Corp.* v. *Metropolitan Dist. Comm'n, supra* at 767 n.2, but went on to conclude that "Sutton experienced a changed condition under § 39N, since the [master's] subsidiary findings support the conclusion that the actual soil conditions differed radically from those described in the contract plans." *Id.*

We agree that Sutton experienced a changed condition within the meaning of the statute, but for slightly different reasons than either the master or the Appeals Court. The Appeals Court correctly criticizes the master's report for improperly focusing on the performance of the equipment, not the actual physical conditions, as required by the statute. G. L. c. 30, § 39N. But the Appeals Court improperly focuses on the description of the conditions set out in the contract plans. *Id.* Where the actual subsurface conditions differ substantially from those conditions "ordinarily encountered and generally recognized as inherent in work of the character provided for in the plans and contract documents," G. L. c. 30, § 39N, there is a changed condition under the meaning of the statute, whether or not the conditions differ from the contract specifications. Thus, contrary to the MDC's assertions, the Federal "Type II" changed condition is explicitly part of Massachusetts law, as demonstrated by both the text of the statute and regulations promulgated pursuant to the statute.[12]

---

[12]Title 350 Code Mass. Regs. § 13.01 (1993) provides, in relevant part:

"(1) The Contractor shall, upon encountering differing subsurface or latent physical conditions, promptly cease operations in the area of such conditions and notify the Engineer, in writing, describing in full detail the subsurface or latent physical conditions at the site which he maintains differs substantially or materially from those shown on the plans or indicated in the contract documents, *or from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the plans and contract documents.* . . .

"If the [MDC] finds that such conditions, as have been described in detail by the Contractor, do exist, and are of such a nature as to cause an increase or decrease in cost of performance of the work or a change in the construction methods required for the performance of the work which results in an increase or decrease in the cost of the work, the [MDC] shall make an equitable adjustment in the contract price . . . ." (Emphasis added.)

The master's subsidiary findings support the conclusion that subsurface conditions at the construction site differed substantially from those "ordinarily encountered and generally recognized as inherent" in the installation of sand drains by the methods specified in the contract. G. L. c. 30, § 39N. The difference in the conditions caused "a change in the construction methods required for the performance of the work which result[ed] in an increase . . . in the cost of the work," see *id.*, a conclusion also supported by the master's findings.[13]

The Appeals Court concluded that Sutton forfeited its claim for an equitable adjustment by failing to follow the procedures for an extra work claim under Article XVIII of the contract. We disagree. Section 39N mandates that its provisions be included in public works construction contracts. It provides a specific procedure and remedy for the contractor encountering differing subsurface or latent physical conditions. Article XVIII, on the other hand, applies to "extra work," rather than work required by the contract. The unexpected soil condition encountered by Sutton required it to modify its construction methods and incur significant additional expense in order to complete the contractually required work. Such modifications and additional expense do not constitute "extra work" within the meaning of Article XVIII. Cf. *Lawrence-Lynch Corp.* v. *Department of Envtl. Management*, 392 Mass. 681, 682-683 (1984).[14]

The cases cited by the MDC are not to the contrary. It is true that contractors seeking to recover payment in excess of the contract price must follow the procedures set out in the contract. See *Lawrence-Lynch Corp.* v. *Department of Envtl. Management, supra* at 684-685, 686; *State Line Contractors, Inc.* v. *Commonwealth*, 356 Mass. 306, 317-319 (1969); *Marinucci Bros. & Co.* v. *Commonwealth*, 354 Mass. 141, 144-145 (1968); *Chiappisi* v. *Granger Contracting Co.*, 352 Mass. 174, 177-178 (1967); *Lewis* v. *Commonwealth*, 332 Mass. 4, 5-7 (1954); *Glynn II, supra* at 394-395; *Skopek Bros.* v. *Web-*

---

[13]We agree with the master that Sutton was not required to conduct independent tests of the subsurface conditions at the site. Demanding such tests would frustrate the policy of G. L. c. 30, § 39N.

[14]Even if Article XVIII did apply to Sutton's claim, "to the extent there may be conflict between the expressed contract and the statutorily required provision, the required provision controls." *Reynolds Bros.* v. *Commonwealth*, 412 Mass. 1, 5 (1992).

*ster Hous. Auth.*, 11 Mass. App. Ct. 947 (1981); *D. Federico Co.* v. *Commonwealth*, 11 Mass. App. Ct. 248, 252-253 (1981). In those cases, recovery was denied when the contractor failed to give timely notice of its claim to the public agency. Without such notice, the contracting authority was unable to monitor the additional expenses incurred by the contractor. Here, on the contrary, Sutton met the procedural requirements for a claim under § 39N: it provided timely written notice of its claim to the MDC. As the master found, the MDC was aware throughout the project of Sutton's additional expense.[15] Furthermore, there was no evidence or finding that the MDC was prejudiced in any way by the lack of an itemized statement of damages. Therefore, we conclude that the MDC's refusal to pay Sutton's additional sand drain installation expenses was improper.[16]

C. *Substitution.* Sutton argues that the MDC should have approved the use of a substitute method of soil compaction under G. L. c. 30, § 39M (*b*) (1994 ed.).[17] The master ruled that "[t]he MDC should have permitted Sutton to substitute the Alidrain or wick system as an 'or equal' system pursuant to Mass. G. L. c. 30, § 39M and the failure or refusal by the MDC to allow the substitution was a breach of its contract with Sutton."

---

[15]The MDC had the right, under its regulations, to request that Sutton furnish itemized statements of costs due to changed conditions. There is no finding that the MDC ever made such a request. See 350 Code Mass. Regs. § 13.01 (6) (1993).

[16]Because we conclude that Sutton is entitled to an equitable adjustment under § 39N, we need not address the master's conclusion that Sutton was excused from complying with the itemized damages provisions of Article XVIII because such compliance would have been futile. Cf. *D. Federico Co.* v. *Bedford Redevelopment Auth.*, 9 Mass. App. Ct. 141, 143 (1980).

[17]General Laws c. 30, § 39M (1994 ed.), provides, in relevant part:

"(*b*) Specifications for [public works construction] contracts . . . shall be written to provide for full competition for each item of material to be furnished under the contract . . . . Every such contract shall provide that an item equal to that named or described in the said specifications may be furnished; and an item shall be considered equal to the item so named or described if (1) it is at least equal in quality, durability, appearance, strength and design, (2) it will perform at least equally the function imposed by the general design for the public work being contracted for or the material being purchased, and (3) it conforms substantially, even with deviations, to the detailed requirements for the item in the said specifications. . . .

"(*e*) The word 'material' as used in this section shall mean and include any article, assembly, system, or any component part thereof."

The master's ruling was incorrect. The wick drain system is not equivalent to the Dutch Bailor method for purposes of substitution under G. L. c. 30, § 39M (*b*). Even if we assume that both systems are "materials" within the meaning of G. L. c. 30, § 39M (*e*), a proposition not free from doubt, they fail at least two of the three requirements for a substitute. First, the wick drain system is not "at least equal" to the Dutch Bailor method in either appearance or design. See G. L. c. 30, § 39M (*b*) (1). Sand drains are water-jetted holes filled with sand; wick drains are porous plastic tubes. The two types of drains are installed by substantially different methods. In particular, the master found that the installation of sand drains displaces significantly more material than wick drain installation. Second, despite the master's contrary conclusion, the wick drain system does not meet the statutory requirement that it "conform[ ] substantially, even with deviations, to the detailed requirements for the item in the . . . specifications." G. L. c. 30, § 39M (*b*) (3). The master found that the two systems were equal in "quality, durability, strength and design" and that the wick drain system "achieved the intent of the specifications" because it performed the same function as the jetted method. Any difference in appearance was "irrelevant," the master found, "because the system was installed below ground level and not visible." The master's ultimate conclusion on the substitution issue is clearly erroneous as a matter of law in light of the information in the record and mutually inconsistent with his subsidiary findings about the nature of the two drain systems. See *Melrose Hous. Auth.* v. *New Hampshire Ins. Co.,* 402 Mass. 27, 34 (1988). The record does not support the master's finding that the two systems were equal in design. There are numerous subsidiary findings detailing the differences in design. In fact, the master's implied finding that the two systems differ in appearance itself suggests two different designs. Appearance is a factor set out in the statute and is not irrelevant, even where the system will not be visible once installed. See *John F. Miller Co.* v. *George Fichera Constr. Corp.,* 7 Mass. App. Ct. 494, 496-497 (1979) (proposed substitute waste piping system in housing construction project was not equal, even though it complied with State plumbing code).

Finally, to the extent that the finding involves the interpretation of a statute, it is a conclusion of law and subject to in-

dependent judicial review. *Pollock* v. *Marshall,* 391 Mass. 543, 555 (1984), and cases cited. The contract specifications detail two permissible methods of soil compaction: jetted sand drains and augered sand drains. Wick drains are not included. The differences between wick drains and the methods in the contract are significantly more than deviations; instead, the wick drain system is a "different animal" entirely. *John F. Miller Co.* v. *George Fichera Constr. Corp., supra* at 497.

The Appeals Court cases addressing this issue support our conclusion. In *John F. Miller Co.* v. *George Fichera Constr. Corp., supra* at 496-498, for example, a subcontractor attempted to substitute one waste piping system for another. The proposed system would have changed the size, number, and location of fittings, pipes, and vents and the materials out of which they were made. *Id.* at 496. The court agreed that the proposed system did not meet the requirements of § 39M (*b*), and was, in fact, "a fairly fundamental change of the design and system prescribed by the specifications." *Id.* at 497.[18] See also *Acmat Corp.* v. *Daniel O'Connell's Sons,* 17 Mass. App. Ct. 44, 48-49 (1983). Cf. *E.A. Berman Co.* v. *Marlborough,* 11 Mass. App. Ct. 1009, 1010 (1981). Therefore, we conclude that, while the MDC owes Sutton an equitable adjustment under the "changed conditions" clause, the MDC did not breach its contract with Sutton by failing to approve the use of the substitute wick drain system.

D. *Spoils material.* We now address the issues raised by Sutton in its cross appeal. The first issue involves Sutton's extra work claim for the costs of removing and replacing spoils material. The master ruled that, under the contract, the MDC had a right to refuse Sutton's request to move the spoils material to the preload area of the construction site. In addition, the master ruled, the MDC had the right to require Sut-

---

[18]Sutton seeks to distinguish the result in *John F. Miller Co.* v. *George Fichera Constr. Corp.,* 7 Mass. App. Ct. 494 (1979), on the ground that a finding of the master in that case supported the court's conclusion. We note, however, that the court may draw its own conclusions from the master's subsidiary findings. Mass. R. Civ. P. 53 (h) (1), as amended, 386 Mass. 1237 (1982).

ton to remove the spoils material and replace it with conforming material without extra cost to the MDC.[19]

Sutton argues that it is entitled to the additional costs incurred in removing the spoils material because those costs were a direct result of the MDC's failure to allow Sutton to use the substitute wick drain system, citing *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.*, 344 Mass. 632, 635 (1962). Because we have concluded, *supra*, that the MDC did not breach the contract by failing to approve the wick drain proposal, Sutton is not entitled to damages arising from such a failure. Furthermore, the contract clearly provides that Sutton was not entitled to recover for the cost of removing and replacing the spoils material. See note 19, *supra*.[20]

E. *Damages calculation*. The master found that the contract

[19]The master relied on the following contract provisions in making his ruling:

"Contamination of material within the drainage blanket at the sand drain periphery shall be removed and replaced with drainage backfill at no additional cost. . . .

"The materials jetted or augered from the holes shall be disposed of in a manner approved by the Engineers. The Contractor shall propose and receive approval of such methods prior to the work. The working surface shall be cleaned of all remaining unsuitable materials after drain installation. Such unsuitable materials include clay or silt lumps or organic matter which, if left in place, would, in the opinion of the Engineer, create 'silt spots' or zones of compressibility [or] weakness in connection with placement of overlying embankment materials.

"*Cleaning-Up*. All . . . dirt, debris and waste materials caused in the performance of the work shall be removed from the work areas from time to time as directed by the Engineer. . . ."

[20]Sutton also argues that the master erred in failing to admit in evidence a 1983 inspector general's report on the MDC, which includes a discussion of the General Lawrence Bridge construction project. According to Sutton, the document fit within the public records exception to the hearsay rule, see *Julian* v. *Randazzo*, 380 Mass. 391, 393 (1980), and would have provided evidence that a bridge plan existed at the time when Sutton was attempting to dispose of the spoils material. Had the MDC furnished Sutton with such a plan, the master found, the spoils material could have been relocated to the preload area of the construction site. Such a relocation presumably would have permitted Sutton to incur less expense. We conclude that the master did not abuse his discretion in excluding the inspector general's report, which alludes to, but does not contain a plan of the bridge replacement design. See *Enrich* v. *Windmere Corp.*, 416 Mass. 83, 84 n.2 (1993). In addition, there was no finding that, had a plan been available, the MDC would have authorized Sutton to relocate the spoils material to the preload area.

limited Sutton's damages to those directly related to the installation of the sand drains under the modified Dutch Bailor method. Consequently, he rejected claims for extended job overhead, delay, and consequential damages. In so doing, the master relied on provisions of the contract relating to payment for extra work, including Article XVIII.[21] Although we have concluded that Article XVIII does not apply to a claim for an equitable adjustment under § 39N, we do not thereby automatically reject the master's approach. Where, as here, there is no contractual or statutory provision for an appropriate measure of damages after the wrongful denial of an equitable adjustment, it is reasonable to refer to the contractual damages formula concerning payment for extra work. Indeed, the MDC's regulations for settling equitable adjustment claims contain a damages formula nearly identical to the one contained in the contract and used by the master. 350 Code Mass. Regs. § 13.01 (7) (b) (1993). We therefore uphold the master's calculation of damages as reasonable and in accordance with the appropriate statutory and contractual provisions.

Sutton argues that it is entitled to a greater measure of damages than the contract provides because, by denying the claim for an equitable adjustment, the MDC allegedly com-

---

[21]The contract sets out the following as one of the acceptable formulae for calculating "payment for extra work":

"(1)   Actual cost of direct labor

"(2)   Actual cost of materials (less salvage value, if any)

"(3)   Actual cost of reasonable rental rates for equipment

"(4)   15% of (1), (2) and (3)

"(5)   Actual cost of Public Liability Property Damage and Workmen's Compensation Insurance and payments under Federal Social Security and Massachusetts Unemployment Compensation acts for subject extra work

"(6)   There shall be no allowance made for superintendence, general or direct overhead charges, nor for the use of small tools and manual equipment."

mitted a "true breach" of the contract.[22] We disagree. A claim for an equitable adjustment under the changed conditions provision is a claim for relief under the contract, and is not a "true" breach of contract claim. *United States* v. *Utah Constr. & Mining Co.*, 384 U.S. 394, 404-405 n.6 (1966). Cf. *Glynn II, supra* at 397-398 (suggesting that, where agency acts in bad faith, unjustified rejection of proper equitable adjustment claim might constitute true breach of contract [dictum]). Sutton's damages, therefore, are limited to those provided by the terms of the contract and the statutes governing public construction projects.

F. *Interest.* In its original appeal, the MDC protested the Superior Court's application of prejudgment interest at the rate of twelve per cent per annum to Sutton's award. We now examine whether the interest award was proper.

In 1993, the way that interest is calculated in judgments against the Commonwealth in contract actions was changed. G. L. c. 231, § 6C, as amended through St. 1993, c. 110, § 224, and § 6I, inserted by St. 1993, c. 110, § 225. Passed as outside sections of an appropriations bill such interest is now calculated by reference to the coupon issue yield equivalent of the price for United States treasury bills, capped at ten per cent. The sections were approved July 19, 1993, but, by St. 1993, c. 110, § 390, were made effective July 1, 1993. The statute did not contain an emergency preamble and did not explicitly state whether it had retroactive effect. The Superior Court clerk entered final judgment in the case on August 16, 1993. Interest was calculated at twelve per cent per annum from the date the complaint was filed (April 20, 1982) until the date of the final judgment.

The MDC argues that the clerk should have applied the new, lower interest rate to the judgment. Sutton responds that, because it was subject to referendum, the amended inter-

---

[22]"When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract." *United States* v. *Utah Constr. & Mining Co.*, 384 U.S. 394, 404-405 n.6 (1966). Recovery for such claims is limited to the remedies provided in the contract. When a particular claim falls outside the contract, such that it is not redressable under specific contract adjustment provisions, it is a "true" breach of contract claim that may justify an award of damages. *Id. Glynn* v. *Gloucester*, 21 Mass. App. Ct. 390, 397-398 (1986). *Glynn* v. *Gloucester*, 9 Mass. App. Ct. 454, 461 (1980).

est statute did not take effect until ninety days after its enactment, citing art. 48, The Referendum, I, of the Amendments to the Constitution of the Commonwealth. Because final judgment entered before the effective date, Sutton argues, the amendment does not apply to this action.

We agree with Sutton that the 1993 amendment does not apply because it became effective after final judgment was entered. Laws which are subject to referendum do not take effect until ninety days after passage, unless they are designated as emergency laws. Art. 48, The Referendum, I. See *Mirageas* v. *Massachusetts Bay Transp. Auth.*, 391 Mass. 815, 819-820 (1984). The MDC argues that this law is not subject to referendum because it "appropriates money for the current or ordinary expenses of the commonwealth," which is an excluded subject under the Constitution. Art. 48, The Referendum, III, § 2. See *Mitchell* v. *Secretary of Admin.*, 413 Mass. 330, 337 (1992); *Powell* v. *Cole-Hersee Co.*, 26 Mass. App. Ct. 532, 535 (1988). In *Mirageas* v. *Massachusetts Bay Transp. Auth.*, *supra* at 820, we assumed that, barring an effective emergency preamble, a statute changing the interest rate applied to judgments would be subject to referendum. The only difference between that case and the one before us is that the 1993 amendment was attached to an appropriations bill as an outside section. We have declined to determine the constitutionality of attaching provisions that do not appropriate funds (outside sections) to appropriation bills. *Mitchell* v. *Secretary of Admin.*, *supra*, quoting *Brookline* v. *The Governor*, 407 Mass. 377, 382, 384 (1990). The practice, even if it is constitutional, would not be effective to insulate a legislative enactment from the operation of art. 48, when that enactment did not pertain to matters excluded from the referendum process by art. 48. Here, the provisions of the bill relating to interest in actions against the Commonwealth are not sufficiently related to appropriations to bring them within the excluded matters provision of art. 48.[23] The clerk's calculation of interest was correct.[24]

---

[23]The parties did not address, and so we do not consider whether prejudgment interest is a proper subject for an outside section of an appropriations bill. See *Brookline* v. *The Governor*, 407 Mass. 377, 382 nn.6 & 7 (1990).

[24]Because we conclude that the amendment took effect after final judgment in the action, we need not address the question of its retroactivity. Cf. *Mirageas* v. *Massachusetts Bay Transp. Auth.*, 391 Mass. 815, 821 & n.9 (1984); *Porter* v. *Clerk of the Superior Court*, 368 Mass. 116 (1975).

G. *Conclusion.* Accordingly, we reject both the MDC's appeals and Sutton's cross appeals. We conclude that Sutton is entitled to recover the full amount of the Superior Court judgment.[25]

*Judgment affirmed.*

---

[25]Sutton has not appealed from the master's ruling in MDC's favor regarding test pile mobilization costs and therefore we do not address that issue.