NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-283

N.E. BRIDGE CONTRACTORS, INC.

vs.

CITY OF LAWRENCE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, N.E. Bridge Contractors, Inc. (NEB), brought this action against the defendant, the city of Lawrence (city), alleging that NEB had a contract with the city to complete bridge repairs and NEB fulfilled its obligations under the contract, but that the city refused to pay NEB for all materials and labor. NEB sought damages for (1) $324,177.50 for additional materials not included in the stated contract price, and (2) $18,441.38, which reflected the difference between the stated contract price of $326,410 and the amount the city paid NEB, $307,968.62. In an amended order on cross motions for summary judgment, a Superior Court judge (motion judge) granted summary judgment in the city's favor on the $324,177.50 for additional materials but concluded that there were genuine issues of material fact as to the $18,441.38 balance. After a

jury-waived trial, a different Superior Court judge (trial judge) concluded that the city committed a breach of contract by not paying NEB the $18,441.38 balance. Both parties appealed. We affirm, but remand for recalculation of prejudgment interest.

Background. This appeal arises out of the city's invitation for bids "to make some scour repairs" around the base of a bridge pier. The invitation to bid included both detailed drawings of the project and estimated quantities of materials needed to perform the work. Bidders were asked to provide prices for clearing the site, mobilization, and the following estimated quantities of materials: eleven cubic yards of concrete, nine hundred tons of riprap, and one thousand tons of modified rockfill. Before the bid deadline of November 30, 2006, NEB submitted a bid of $286,410. On May 7, 2008, the city entered into a contract with NEB to perform the work.

The contract included several provisions regarding the scope of NEB's services and how the parties would handle changes to the scope of those services. Under the scope of services provisions, NEB's work "consist[ed] of straightening out a section of steel sheeting and filling a void . . . underwater in the Merrimack River with modified fill, riprap and tremie concrete" using "[t]he quantities of material . . . estimated in the [s]chedule of [p]rices." Paragraph 3 of the contract stated that "[t]he above tasks and items [were] not intended to be all

2

inclusive" and included the following provisions for additions

or deletions to NEB's scope of services:

> "The [c]ity may add to or delete any items, provided that any added items are of a similar nature, and provided that the total cost of such work does not exceed the total cost as specified in [p]aragraph 8 hereof. [NEB] shall undertake such work only upon the direction of the [c]ity. All directives and changes thereof in conformance with this [a]greement shall be in written form, prepared and signed by the [c]ity and accepted and countersigned by [NEB] or his authorized representatives. Any added tasks or items which are not agreed to be within the [s]cope of [s]ervices by both the [c]ity and [NEB], or which will incur costs beyond the total cost specified in [p]aragraph 8, shall be handled in accordance with [p]aragraph 13 hereof."[1]

Paragraph 13 stated that if NEB provided services "not to the satisfaction of the [c]ity, the [c]ity [could] request that [NEB] refurnish services at no additional cost" or "purchase services in substitution," and that the city could deduct the cost of substituted services or the nonperformance of services from the contract price. In addition, the contract incorporated by reference the Massachusetts Highway Department's Standard Specifications for Highways and Bridges, and those specifications recited the requirements of G. L. c. 30, § 39N. Under G. L. c. 30, § 39N, all contracts subject to G. L. c. 149, § 44A, or G. L. c. 30, § 39M, must set forth the procedure for

---

[1] Likewise, paragraph 12 provided that any changes in the scope of services, "including any increase or decrease in the amount of [NEB's] compensation or any change in the work schedule, which are mutually agreed upon by and between the [c]ity and [NEB], shall be incorporated in written amendments to this [a]greement."

3

addressing differing subsurface or latent physical conditions and specify that requests for equitable adjustments due to those conditions be made in writing.

The contract also included several provisions regarding compensation. "The [c]ity agree[d] to pay [NEB] the compensation specified in Schedule B, Compensation and Method of Payment, . . . which shall constitute complete compensation for all services rendered and for such reimbursable expenses as authorized per paragraph 9." By paragraph 9, "[t]he [c]ity agree[d] to reimburse [NEB] only for those direct costs incurred by [NEB] pursuant to the performance of work under this [a]greement as set forth and authorized within Schedule B." Schedule B provided that payment was "not to exceed $286,410."

Around the time the parties entered into the contract, NEB requested a price increase of $40,000, noting that there had been a significant increase in the cost of supplies, materials, and fuel since it bid on the project over one year prior. The city approved the $40,000 increase, bringing the contract price to $326,410. The increase was memorialized in a written change order signed by the parties at various times in May through July of 2008.

Thereafter, two disputes arose between the parties. The first dispute, which concerned NEB's claim that it used

4

$324,177.50 in additional materials,[2] was resolved on summary judgment. We recite the facts pertinent to that dispute in the light most favorable to NEB. See HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 326-327 (2022). When NEB began its work, its divers encountered a larger void than the one depicted on the detailed project drawings, and it "became apparent" to NEB that "additional quantities of certain materials specified in the [c]ontract would be required in order to perform the work." On or around July 22, 2008, NEB filled the void using 154 cubic yards of cement, an overrun of 143 cubic yards of cement, without obtaining a written change order. NEB also used an additional 170.54 tons of riprap. NEB's president, John Waitkus, submitted an affidavit stating that a city engineer and a representative of the city's authorized field engineer, Fay, Spofford & Thorndike, LLC (FST), told him that they had authority to approve NEB's use of additional materials, and that they did approve of that use. On August 6, 2008, the city held a meeting to discuss the material overruns. At the meeting, NEB was asked to submit a written change order request for the

---

[2] In its complaint, NEB alleged that it was owed $324,177.50 for additional materials and labor, but NEB later asserted on summary judgment that it was owed $299,734.24 for additional materials. While the difference between the amounts could, perhaps, be attributable to labor, NEB also stated at another point that "[n]one of the amount claimed due [was] for additional labor or services." Regardless, nothing in our analysis turns on the difference between the amounts.

5

additional materials.  NEB submitted the written change order request, which was denied.[3]

The second dispute concerned the fact that the city paid NEB $307,968.62 of the $326,410 contract price, leaving an $18,441.38 balance.  At trial, the city argued that it was excused from paying NEB the balance on the basis that NEB did not straighten the steel sheeting or install modified rockfill and riprap along the outer side of the sheeting.  As we discuss infra, the city has not shown that any of the trial judge's findings are clearly erroneous, and we therefore describe the material facts as the trial judge found them.  See Kendall v. Selvaggio, 413 Mass. 619, 620 (1992).  Waitkus inspected the underwater work site before work commenced and suggested leaving the steel sheeting in place.  The city agreed to that suggestion.  An expert witness called by the city also agreed that (1) "the better decision was . . . to not re-bend the steel sheeting" into a straight position and (2) not re-bending the steel sheeting "was proper."  The city "accepted [NEB's] work as finished," "never complained about [NEB's] work or issued a

_____

[3] While we view the facts in the light most favorable to NEB, we note the following for context, to explain the dispute between the parties.  The city has taken the position that (1) "[its] engineers did not approve" NEB's use of additional materials, (2) once NEB filled the void, "a substantive investigation was impossible," and (3) NEB's claim for $324,177.50 for additional materials was "immediately circumspect, and summarily rejected."

6

demand for performance,"[4] and "did not offer anyone who testified to the reasons for partially paying [NEB] and denying the balance."  "[N]o work has been performed on the site since [then]."  Based on these findings, the trial judge concluded that NEB performed under the contract, and that the city committed a breach of contract by not paying NEB the $18,441.38 balance.

Discussion.  1.  Summary judgment.  On summary judgment, the motion judge concluded that, where NEB did not obtain a written change order for the $324,177.50 in additional materials, the city was not required to pay NEB for those additional materials.  NEB argues error in the motion judge's conclusion.  NEB asserts that its use of additional materials was contemplated and compensable under the terms of the contract without a written change order, and that the contract described the required quantities of materials as estimates "for no other purpose but to allow for adjustment once the [w]ork had commenced and a better understanding of what materials were necessary to complete the [w]ork was ascertained."  NEB also

_____

[4] In fact, the city engineer sent a letter "[o]n behalf of the [city's] Department of Public Works" to the conservation commission requesting that the conservation commission issue a certificate of compliance for the pier, noting that "the [Mass]achusetts Highway Underwater Inspection Team inspected the work and gave [its] approval that the work performed was satisfactory to solve the problem."

7

asserts that its use of additional materials was compensable as a reimbursable expense. We disagree.

"The interpretation of a contract . . . presents a question of law for the court, subject on appeal to de novo review." Biewald v. Seven Ten Storage Software, Inc., 94 Mass. App. Ct. 376, 380 (2018). We construe the words of a contract "according to their plain meaning, in the context of the contract as a whole." Lieber v. President & Fellows of Harvard College, 488 Mass. 816, 823 (2022). "When the words of a contract are clear, they control." Id.

As a whole, the contract did contemplate the possibility that NEB would need to use additional materials, but the contract also required NEB to obtain a written change order before doing so. Paragraph 3 provided that the city could "add to or delete any items," but that any such changes had to "be in written form." Paragraph 12 provided that the city could "increase or decrease . . . the amount of [NEB's] compensation," but that any such increase or decrease had to "be incorporated in written amendments to this [a]greement." NEB plainly understood the requirement for a writing because it prepared one for the $40,000 change order. Where the contract required a written amendment and it was undisputed that NEB never submitted one for the additional materials, the judge correctly concluded that the city was not required to pay for them. Moreover, NEB's

8

use of $324,177.50 in additional materials, an amount that would have nearly doubled the contract price, was not compensable as a reimbursable expense, because "[t]he [c]ity agree[d] to reimburse [NEB] only for those direct costs incurred by [NEB] pursuant to the performance of work under this [a]greement as set forth and authorized within Schedule B."  Schedule B did not authorize any costs in excess of the stated contract price.

Our interpretation is consistent with the requirements of G. L. c. 30, § 39N, which were incorporated in the contract through the Massachusetts Highway Department's Standard Specifications for Highways and Bridges.  The requirements of G. L. c. 30, § 39N, specify that requests for equitable adjustments due to differing subsurface or latent physical conditions be made in writing.  This allows a contracting authority to investigate the physical conditions and "monitor the additional expenses incurred by the contractor."  Sutton Corp. v. Metropolitan Dist. Comm'n, 423 Mass. 200, 208 (1996). NEB's interpretation, that $324,177.50 in additional materials was compensable as a reimbursable expense, would run counter to the statutory requirements.  See G. L. c. 30, § 39N.[5]

---

[5] Furthermore, the Supreme Judicial Court has interpreted G. L. c. 44, § 31, to prohibit "a contractor [from] recover[ing] for work not contemplated by a contract" but allow the contractor to "recover for damages suffered as a result of the municipality's breach of contract."  Perseus of N.E., MA, Inc. v. Commonwealth, 429 Mass. 163, 166 (1999).  Here, NEB seeks payment for

We are unpersuaded by NEB's alternative argument that the city engineer and the FST representative had apparent authority to waive the written change order requirement.[6]  "[T]he doctrine of apparent authority does not apply to the government, its agencies, or its officials."  Dagastino v. Commissioner of Correction, 52 Mass. App. Ct. 456, 458 (2001).[7]  Even if that were not true, the summary judgment record does not support an inference of apparent authority.  "Apparent authority exists

---

additional materials not contemplated by the contract, not damages suffered as a result of the city's breach of contract. Given the statutory limitations at issue, NEB's equitable claims also fail.  "[A] party cannot evade the statutory limitations on a municipality's contracting power by rendering services and subsequently seeking recovery based on alternative theories" (citation omitted).  Celco Constr. Corp. v. Avon, 87 Mass. App. Ct. 132, 136 (2015).

[6] Relatedly, NEB argues that the city waived the requirement of a written change order for the additional materials by accepting NEB's work as finished.  This argument is meritless.  Regardless of whether the city accepted NEB's work as finished, a question we address infra, the city promptly questioned NEB's use of the additional materials, required NEB to submit a written change order request for the additional materials, and did not waive the requirement of a written change order for the additional materials.

[7] Costonis v. Medford Hous. Auth., 343 Mass. 108 (1961), on which NEB relies, is not to the contrary.  That case involved a housing authority, which is "a public body politic and corporate" and is "liable in contract or in tort in the same manner as a private corporation" (citations omitted).  Ryan v. Boston Hous. Auth., 322 Mass. 299, 300 (1948).  Thus, "Massachusetts courts have permitted the presentation of evidence to demonstrate that an agent of a housing authority had implied or apparent authority to enter a contract on the housing authority's behalf and have at times found such implied or apparent authority to exist."  Lowell Hous. Auth. v. PSC Int'l, Inc., 692 F. Supp. 2d 180, 189 (D. Mass. 2010).

when the principal, by his or her words or conduct, causes a third person to reasonably believe that the principal consents to the agent acting on the principal's behalf." Fergus v. Ross, 477 Mass. 563, 567 (2017). "[O]nly the words and conduct of the principal, . . . and not those of the agent, are considered in determining the existence of apparent authority" (citation omitted). Id. On summary judgment, NEB relied on conclusory statements that the city engineer and the FST representative "supervised and directed" the project and that they purported to be the city's "authorized agents and representatives," and not on any words or conduct of the city. This was insufficient to support an inference that the city engineer or the FST representative had apparent authority to waive the written change order requirement, especially for a change that would have effectively doubled the contract price.[8]

2. Trial. Following a jury-waived trial, the trial judge concluded that NEB performed under the contract and that the

---

[8] We note that NEB also argues that the law of the case doctrine required the motion judge to defer to a motion to dismiss ruling in which another Superior Court judge stated that NEB's use of additional materials did not require a written change order. This argument is unavailing. The dispositive question before us -- how to interpret the contract language using the materials described in Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002) -- is a question of law that we review de novo and is fundamentally different from the question posed by a motion to dismiss -- whether the allegations of the complaint, if true, plausibly suggest an entitlement to relief. Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

11

city committed a breach of contract by not paying NEB the $18,441.38 balance. The city argues that (1) NEB waived its claim for the $18,441.38 balance, (2) some of the trial judge's findings are clearly erroneous, and (3) NEB may not recover under the contract where NEB did not straighten the steel sheeting or install riprap along the outer side of the sheeting. On the last point, the city argues that separate and apart from the contractual provisions requiring written change orders, G. L. c. 30, § 39I, bars NEB from recovering under the contract where NEB did not obtain written authorization. We disagree.

First, the city argues that NEB waived its claim for the $18,441.38 balance. By way of background, the motion judge initially allowed the city's motion for summary judgment on NEB's claims in their entirety. NEB moved for relief from that summary judgment order, arguing that there were genuine issues of material fact with respect to the $18,441.38 balance. The motion judge agreed, and an amended order so entered. The city contends that this was the first time NEB asserted a claim for the $18,441.38 balance, but that is not correct. NEB's complaint alleged that the city agreed to pay NEB the undisputed amount of $326,410, that NEB incurred $324,177.50 in disputed costs for additional materials, and that the city paid NEB $307,968.62. NEB went on to allege that the sum of the undisputed and disputed amounts was $629,117.46, which we note

12

is not the sum of $324,177.50 and $326,410, and that the city therefore owed NEB $321,148.84. Despite the apparent mathematical error, NEB's complaint plainly set forth a claim for the balance on the undisputed amount. The city also contends that, early in the litigation, NEB explicitly stated that it was seeking reimbursement solely for the additional materials, but the city reads NEB's statement out of context. NEB's statement was made in the context of clarifying that it was seeking reimbursement for the additional materials, not any extra labor, and did not affect a waiver of its claims for the $18,441.38 balance.

Second, the city challenges the trial judge's finding that the city's expert witness agreed that (1) "the better decision was . . . not to re-bend the steel sheeting" into a straight position and (2) not re-bending the steel sheeting "was proper." The city also challenges the trial judge's finding that the city "did not offer anyone who testified to the reasons for partially paying [NEB] and denying the balance," contending that the city's expert witness provided this testimony. We review for clear error, and discern none. See T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569 (2010).[9]

_____

[9] In addition, the city asserts that the trial judge "failed" to find that no riprap was present on the outer side of the metal sheeting. However, that finding is implicit in the trial judge's analysis. The trial judge noted two deviations:

13

The city's expert witness testified that he agreed with "Waitkus in the sense that that was too hard to do that," i.e., straighten the steel sheeting. It is true, as the city notes, that the expert went on to testify that the "best thing" would have been to "cut [the bent part] and make a new steel sheeting," but that does not alter the fact that, on the key issue of whether NEB should have straightened the steel sheeting, the expert testified that it would have been "too hard" to do so. Regarding whether the expert testified to the city's reasons for partially paying NEB and denying the balance, the expert agreed that, in his opinion, NEB was "not entitled to payment for work [it] did not complete." However, the expert did not testify to any firsthand knowledge regarding the city's specific reasons for partially paying NEB and denying the balance, or why the city decided to pay NEB the precise amount of $307,968.62. In sum, the trial judge's findings are not clearly erroneous.

Third, the city argues that NEB may not recover under the contract where NEB did not straighten the steel sheeting or install riprap along the outer side of the sheeting as called for by the contract. In resolving this question, we are bound by the trial judge's factual findings. The trial judge's

keeping the metal sheeting in place and the "placement of riprap."

14

analysis turned in part on the idea that the city waived the contractual requirement of a written change order for the deviations at issue. That finding is supported by subsidiary findings that the city "accepted [NEB's] work as finished" -- which included not re-bending the sheeting or installing riprap along its outer side -- and "never complained about [NEB's] work or issued a demand for performance," which findings are supported by the evidence.[10] See Parks v. Johnson, 46 Mass. App. Ct. 905, 906 (1998) (appellate court does not retry facts).

The question remains whether G. L. c. 30, § 39I, nonetheless bars NEB from recovering under the contract for steel sheeting it did not straighten and riprap it did not install. That statute requires every contractor having a contract for the repair of any public works to "perform all the work required by such contract in conformity with the plans and specifications contained therein," and that "[n]o wilful and substantial deviation from said plans and specifications shall be made unless authorized in writing." In arguing that G. L. c. 30, § 39I, bars NEB from recovering, the city relies on this court's statement in Glynn v. Gloucester, 9 Mass. App. Ct. 454, 461 (1980), that "[i]f any claim arises from the contractor's

_____

[10] In contrast, with respect to NEB's use of additional materials, the city promptly questioned the overruns and required NEB to submit a written change order request.

15

wilful and substantial deviation from the plans and specifications, there can be no recovery without a showing of compliance with the requirements of G. L. c. 30, § 39I." The city reads this statement too broadly. In the same paragraph, id. at 460, the court stated that if a contractor must "perform extra work or incur added expense," the contractor must follow proper procedures "before unilaterally accruing expenses to be pursued later," and that public authorities are expected to address legitimate problems in good faith and to compensate contractors "for bona fide extras." In Glynn, supra at 455, 460-461, a contractor asserted a claim for extra expenses incurred in connection with a municipal construction contract, and the court's statement, that "there can be no recovery without a showing of compliance with the requirements of G. L. c. 30, § 39I," specifically pertained to claims for extra expenses.

This case presents a different question: whether NEB may recover the stated contract price where the city accepted NEB's work as finished but did not provide written authorization for certain contract deviations. We note that the city had ample opportunities to challenge whether NEB should have straightened the steel sheeting and installed riprap along the outer side of the sheeting. If NEB provided services "not to the satisfaction of the [c]ity," the contract permitted the city to "request that

16

[NEB] refurnish services at no additional cost" or "purchase services in substitution."  Having chosen instead to accept NEB's work as finished, the city may not avoid its contractual payment obligations solely on the basis that it did not provide written authorization for deviations it approved.

3.  <u>Prejudgment interest</u>.  Lastly, the parties dispute the date from which prejudgment interest should have begun to accrue.  General Laws c. 231, § 6C, provides that "[i]n all actions based on contractual obligations, . . . interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand."  However, "[i]f the date of the breach or demand is not established, such interest shall be added . . . from the date of the commencement of the action."  G. L. c. 231, § 6C.  Here, interest was added from the date of the commencement of the action.  Both parties argue that this was error.  NEB argues that interest should have been added from August 15, 2008, the date it sent a letter requesting full payment on the stated contract price.  That letter was introduced in evidence, and the city does not dispute its authenticity or offer any other reason why it could not be relied on to establish the date of demand.[11]  The city instead

---

[11] The city does suggest that we are bound by the trial judge's finding that there was no "credible evidence" of the date of

17

argues that NEB did not assert a claim for the $18,441.38 balance until March 8, 2017, when NEB filed its motion for relief from the original summary judgment order, and that interest should have been added from that date.  As we have explained, the city's argument that NEB did not assert a claim for the $18,441.38 balance until moving for relief from the original summary judgment order is without merit.  In light of the August 15, 2008 letter establishing the date of NEB's demand, we conclude that interest should have been added from that date.

Conclusion.  So much of the judgment as awarded prejudgment interest from the date of the commencement of the action is vacated, and the matter is remanded for recalculation of prejudgment interest running from August 15, 2008.  In all other respects, the judgment is affirmed.

So ordered.

By the Court (Meade, Blake & Brennan, JJ.[12]),

Clerk

Entered:  July 24, 2023.

---

demand.  Given the undisputed documentary evidence and the lack of further explanation by the judge, we do not find this argument persuasive.

[12] The panelists are listed in order of seniority.